IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division

JAMYCE VINSON,

       Plaintiff,

v.                                                     Civil Action No. 3:22cv698

CITY OF RICHMOND,

       Defendant.

**MEMORANDUM OPINION**

This matter comes before the Court on Defendant City of Richmond's ("City" or "Richmond") Partial Motion to Dismiss (the "Motion"). (ECF No. 8.) Plaintiff Jamyce Vinson responded, and the City replied. (ECF Nos. 10, 12.) This matter is fully briefed and ripe for disposition.

The Court dispenses with oral argument because the materials before it adequately present the facts and legal contentions, and argument would not aid the decisional process. Thus, the Court denies Vinson's Consent Motion for a Hearing. (ECF No. 13.)

For the reasons stated below, the Court will grant the City's Motion. (ECF No. 8.)

## I. Factual and Procedural Background

### A.     Factual Background[1]

On October 21, 2014, Jamyce Vinson began her employment with the City as an Accountant III. (ECF No. 1 ¶ 10.) In November 2015, the City promoted her to Accounting Manager in the finance department. (ECF No. 1 ¶ 10.) She remained in that role until January 2022. (ECF No. 1 ¶ 10.)

At or around January 2021, Ms. Vinson began suffering from extreme stress, anxiety, severe back pain, a sleep disorder, vitamin deficiencies, and a digestive disorder that caused her to involuntarily vomit during the day. (ECF No. 1 ¶ 15.) These health conditions "constitute disabilities, each of which individually and/or together substantially limits one or more major life activities." (ECF No. 1 ¶ 17.) Her health conditions required a consistent schedule, frequent short breaks throughout the workday, and a work schedule not to exceed forty hours per week. (ECF No. 1 ¶ 18–19.) Ms. Vinson informed her supervisor about her medical conditions. (ECF No. 1 ¶ 16.)

On July 2021, Ms. Vinson filed a complaint with the Office of the Inspector General regarding "debt that the City was hiding from the public." (ECF No. 1 ¶ 20.) She reported "an enormous value of unreconciled accounts totaling over fourteen million dollars in debt." (ECF No. 1 ¶ 20.)

---

[1] For purposes of the Rule 12(b)(6) Motion to Dismiss, the Court will accept the well-pleaded factual allegations in Ms. Vinson's Complaint, (ECF No. 1), as true and draw all reasonable inferences in favor of Vinson. *See Kensington Volunteer Fire Dep't, Inc. v. Montgomery Cty., Md.*, 684 F.3d 462, 467 (4th Cir. 2012) ("a court 'must accept as true all of the factual allegations contained in the complaint' and 'draw all reasonable inferences in favor of the plaintiff.'") (quoting *E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc.*, 637 F.3d 435, 440 (4th Cir. 2011)).

2

In response to Ms. Vinson making her complaint, the City of Richmond retaliated against her. (ECF No. 1 ¶ 20–21.) Beginning August 5, 2021, Ms. Vinson's supervisor, Sheila White, demanded increasing amounts of work from Ms. Vinson. (ECF No. 1 ¶ 21.) The increased work exacerbated Ms. Vinson's disability and made her medical conditions worse. (ECF No. 1 ¶ 21.)

On August 17, 2021, Ms. White instructed Ms. Vinson to begin reporting to Virginia Ibay as her new supervisor. (ECF No. 1 ¶ 23.)

On August 19, 2021, Ms. Vinson informed Ms. Ibay that she would be taking leave pursuant to the Federal and Medical Leave Act ("FMLA")[2] beginning on August 23, 2021. (ECF No. 1 ¶ 24.) Ms. Vinson was required "to work the weekend before her FMLA leave began, between August 19 through August 23, 2021[,] when no other employee was required to do so." (ECF No. 1 ¶ 22.)

Ms. Vinson was on FMLA leave for approximately two months, from August 23, 2021, through October 25, 2021. (ECF No. 1 ¶ 26.)

Upon her return to work on October 25, Ms. Vinson began receiving emails from Ms. White, requesting Ms. Vinson to complete work that Ms. White claimed should have been completed while Ms. Vinson was on medical leave. (ECF No. 1 ¶ 28.) This work, however, was supposed to have been assigned to other employees. (ECF No. 1 ¶ 28.)

Also on October 25, Ms. Vinson requested as a reasonable accommodation that she (1) work no more than forty hours a week; (2) be allowed a one-hour lunch break; (3) be allowed four five-minute breaks throughout the workday; and (4) not be required to work on weekends. (ECF No. 1 ¶ 29.) That same day, Ms. Vinson spoke with Human Resources Representative

---

[2] Family Medical Leave Act (FMLA) of 1993, 29 U.S.C. § 2601.

Veronica Kenner, who informed Ms. Vinson that she would schedule a meeting to discuss her request for accommodations with Ms. Vinson's supervisor. (ECF No. 1 ¶ 30.)

On October 26, 2021, Ms. Vinson called out sick from work and notified her supervisor, Virginia Ibay. (ECF No. 1 ¶ 31.) The next day, Ms. White emailed Ms. Vinson stating that the supervisor change had not been completed and that Ms. White was still Ms. Vinson's supervisor. (ECF No. 1 ¶ 31.)

On October 27, 2021, just two days after Ms. Vinson requested accommodations, Ms. White demanded that Ms. Vinson complete the "Pension and OPEB Liabilities Report" by the close of business the following day. (ECF No. 1 ¶ 33.) The task was "impossible due to the large amount of work it entailed and the time frame it was requested to be completed in." (ECF No. 1 ¶ 33.) Ms. White knew that it would take weeks to complete the task. (ECF No. 1 ¶ 33.) Ms. Vinson informed Ms. White that the amount of work within the time frame was "unreasonable and unrealistic." (ECF No. 1 ¶ 34.)

While certain journal entries should have been reassigned and completed by other employees in September and October while Ms. Vinson was out on FMLA leave, Ms. White ordered Ms. Vinson to complete the entries and stated that Ms. Vinson was holding up the process. (ECF No. 1 ¶ 35.)

Despite Ms. Vinson's request for accommodations, Ms. White required Ms. Vinson to work long days, including evenings and weekends. (ECF No. 1 ¶ 36.) Ms. White required Ms. Vinson to work as late as 1:00 a.m. on some Saturdays, as well as work Friday, Saturday, and Sunday for twelve-to-sixteen-hour periods. (ECF No. 1 ¶ 36.) Ms. Vinson was in pain all day and suffered from spasms due to the high demands Ms. White placed on her. (ECF No. 1 ¶ 36.)

4

On November 10, 2021, Ms. White scheduled a meeting for Saturday, November 13, 2021, at 8:00 a.m. (ECF No. 1 ¶ 37.) On November 13, 2021, Ms. Vinson emailed Ms. White advising her that she could not attend the Saturday morning meeting because she had worked twelve-hour days the past two days, including working until 9:00 p.m. the night prior. (ECF No. 1 ¶¶ 37–38.) In the email, Ms. Vinson reminded Ms. White that she had health-related problems that she was receiving treatment for and explained that the twelve-hour days exacerbated her health issues, leading to her inability to attend the meeting. (ECF No. 1 ¶ 38.) However, Ms. Vinson later informed Ms. White that she took pain medication and arrived at the office. (ECF No. 1 ¶ 38.) White then emailed Human Resources to ask about the status of Ms. Vinson's request for reasonable accommodations. (ECF No. 1 ¶ 38.)

On November 22, 2021, Ms. Vinson, Ms. White, and ADA Coordinator Kenner[3] had a meeting to discuss Ms. Vinson's request for reasonable accommodations. (ECF No. 1 ¶ 39.) During the meeting, Ms. Vinson provided medical documentation from her healthcare provider. (ECF No. 1 ¶ 39.) While ADA Coordinator Kenner reviewed Ms. Vinson's request, Ms. White stated, "I will still need her to work until 7:30 or 8:30 [p.m.] at night." (ECF No. 1 ¶ 40.) ADA Coordinator Kenner then ended the meeting and told Ms. Vinson that she would "summarize the meeting" and schedule a follow-up meeting. (ECF No. 1 ¶ 40.)

On November 23, 2021, one day after Ms. Vinson's reasonable accommodations meeting, Ms. White approached Ms. Vinson at her cubicle and told her to leave the building because Ms. White was placing her on administrative leave. (ECF No. 1 ¶ 41.) Ms. White

---

[3] In paragraph 30, Ms. Vinson refers to Human Resources Representative Veronica Kenner, and in paragraph 39, Ms. Vinson refers to ADA Coordinator Kenner. (ECF No. 1 ¶¶ 30, 39.) While the Court acknowledges that it is unlikely that Human Resources Representative Kenner and ADA Coordinator Kenner are different people, for the sake of clarity, the Court refers to each Kenner as described in the Complaint.

forced Ms. Vinson to immediately turn in her employee badge, and security escorted Ms. Vinson out of the building without further explanation. (ECF No. 1 ¶ 41.)

On November 30, 2021, ADA Coordinator Kenner emailed Ms. Vinson summarizing Ms. Vinson's interactions with the Department of Human Resources and providing next steps. (ECF No. 1 ¶ 42.) The email explained that the Department of Human Resources had received Ms. Vinson's request for accommodations on November 9, 2021, and that on November 22, 2021, a virtual ADA Interactive Process Meeting ("IPM") had been held with Ms. Vinson, Ms. White, and ADA Coordinator Kenner present. (ECF No. 1 ¶ 42.) The email further explained that Ms. White had indicated that she would meet with Ms. Vinson to discuss how to reallocate marginal duties and that the department would accommodate Ms. Vinson's request for rest and break periods. (ECF No. 1 ¶ 42.) The email also stated that in a December 2, 2021 follow-up IPM meeting, they would discuss the accommodations the Department would grant Ms. Vinson. (ECF No. 1 ¶ 42.)

That same day, on November 30, 2021, Ms. Vinson sent a letter to Mona Adkins Easley, Director of Human Resources, Anisha Trice, Human Resources Generalist Lead, and Ms. White asking for an explanation of the administrative leave and demanding to know why she was placed on leave without pay. (ECF No. 1 ¶ 43.)

On December 3, 2021, Ms. Vinson received a letter from Ms. White that was dated December 1, 2021. (ECF No. 1 ¶ 44.) It stated that effective November 29, 2021, Ms. Vinson was being placed on leave without pay "for a possible violation of the City's Personnel Rules/Administrative Regulations." (ECF No. 1 ¶ 44.) The letter indicated that Ms. Vinson could not re-enter the workplace or represent the City or Department of Finance in any manner. (ECF No. 1 ¶ 44.)

Around early December 2021, the City placed a photograph of Ms. Vinson in the lobby of Richmond's City Hall Building in the Department of Public Works, Security Department, identifying Ms. Vinson as prohibited from entering the building. (ECF No. 1 ¶ 45.)

On January 11, 2022, the Richmond City Counsel Office of the Inspector General issued a report presenting the results of the investigation of the unreconciled accounts Ms. Vinson filed complaints about in July 2021. (ECF No. 1 ¶ 48–50.) The Inspector General found that the complaint Ms. Vinson filed was substantiated and accurate. (ECF No. 1 ¶ 51.) The report indicated that two accounts had not been reconciled since Fiscal Year ("FY") 2017 but had been falsely represented to external auditors as being reconciled accounts. (ECF No. 1 ¶ 51.) According to the report, the cumulative unreconciled difference between FY2017 and FY2020 was $14,957,724.55, that Ms. White had been notified of the issue, but still approved the FY2020 year-end report. (ECF No. 1 ¶¶ 51–52.)

On January 27, 2022, Ms. Vinson received a letter notifying her that she was being recommended for termination from the City of Richmond, Department of Finance. (ECF No. 1 ¶ 56.) Ms. Vinson contends that this happened because Ms. "White retaliated against [Ms.] Vinson for [Ms.] Vinson's report to the Mayor and Inspector General." (ECF No. 1 ¶ 57.) After the January 27, 2022 letter, Ms. Vinson did not receive any other information regarding the status of her employment. (ECF No. 1 ¶ 58.)

On or about February 7, 2022, Ms. Vinson timely filed a charge alleging discrimination on the basis of disability with the United States Equal Employment Opportunity Commission ("EEOC"). (ECF No. 1, at 3–4.)

On May 25, 2022, Ms. Vinson sent correspondence to Mona Adkins Easley in the City's Human Resources Department, stating that due to the adverse actions taken by the City over the

past several months, Ms. Vinson had no choice but to resign from her position as Accounting Manager effective May 31, 2022. (ECF No. 1 ¶ 59.) In July 2022, Ms. Vinson received notice of her rights to continue her health insurance coverage under COBRA. (ECF No. 1 ¶ 60.)

On September 6, 2022, in response to her EEOC charge, the United States Department of Justice issued Ms. Vinson a Notice of Right to Sue Letter. (ECF No. 1, at 4.) Ms. Vinson filed her Complaint within 90 days of receipt of the Right to Sue Letter. (ECF No. 1, at 4.)

### B. **Procedural Background**

On October 28, 2022, Ms. Vinson filed this five-count Complaint against the City. Namely, Ms. Vinson brings the following claims against the City:

Count I: Discrimination and Retaliation in Violation of Virginia Code § 8.01-216.8 (Fraud Against Taxpayers Act), (the "VFATA Claim");[4]

---

[4] The Virginia Fraud Against Taxpayers Act ("VFATA") "is modeled after the federal False Claims Act and seeks to eliminate fraud regarding money or property belonging to the Commonwealth of Virginia." *Whitaker v. City of Hopewell, Virginia*, No. 3:19-CV-923, 2020 WL 7246593, at *10 (E.D. Va. Dec. 9, 2020) (*citing Brockdorff v. Wells Mgmt. Grp., LLC*, No. 3:15cv137, 2015 WL 3746241, at *4 (E.D. Va. June 15, 2015)). "The VFATA 'includes an anti-retaliation provision' that punishes employers who retaliate against an employee who tries to prevent a violation of the VFATA." *Whitaker v. City of Hopewell, Virginia*, No. 3:19-CV-923, 2020 WL 7246593, at *10 (E.D. Va. Dec. 9, 2020) (*quoting Brockdorff v. Wells Mgmt. Grp., LLC*, No. 3:15cv137, 2015 WL 3746241, at *4 (E.D. Va. June 15, 2015)); Va. Code Ann. § 8.01-216.8 (2014). In pertinent part, the VFATA provides,

> Any employee, contractor, or agent shall be entitled to all relief necessary to make that employee, contractor, or agent whole, if that employee, contractor, or agent is discharged, demoted, suspended, threatened, harassed, or in any other manner discriminated against in the terms and conditions of employment because of lawful acts done by the employee, contractor, agent, or associated others in furtherance of an action under this article or other efforts to stop one or more violations of this article.

Va. Code. Ann. § 8.01-216.8 (2014).

8

| | |
|---|---|
| Count II: | Wrongful Termination in Violation of Public Policy (VA Values Act), (the "VHRA *Bowman*[5] Claim");[6] |
| Count III: | Section 504(a) of the Rehabilitation Act of 1973, 29 U.S.C. § 794(a);[7] |
| Count IV: | ADA, 42 U.S.C. 12101 *et. seq* Disparate Treatment and Failure to Accommodate;[8] and, |
| Count V: | FMLA retaliation.[9] |

---

[5] *Bowman v. State Bank of Keysville*, 331 S.E.2d 797 (Va. 1985). As discussed in depth below, *Bowman* articulates an exception to Virginia's at-will employment doctrine and, in some circumstances, allows a cause of action for an employment termination that violates public policy.

[6] The July 1, 2020 amendment of the Virginia Human Rights Act ("VHRA") changed the Act's title to the Virginia Values Act. However, because the parties—and previous cases—continue to refer to the act as the VHRA, Court will do so here for clarity.

The VHRA's stated policy is to "[s]afeguard all individuals within the Commonwealth from unlawful discrimination in employment because of race, color, religion, national origin, sex, pregnancy, childbirth or related medical conditions, age, marital status, sexual orientation, gender identity, military status, or disability." Va. Code Ann. § 2.2-3900 (2021). It prohibits "[c]onduct that violates any Virginia or federal statute or regulation governing discrimination on the basis of race, color, religion, sex, sexual orientation, gender identity, marital status, pregnancy, childbirth or related medical conditions including lactation, age, military status, disability, or national origin." Va. Code Ann. § 2.2-3902 (2021).

[7] The Rehabilitation Act of 1973 provides, in relevant part:

> No otherwise qualified individual with a disability in the United States . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance or under any program or activity conducted by any Executive agency or by the United States Postal Service.

29 U.S. Code § 794.

[8] Under the Americans with Disabilities Act of 1990 (the "ADA"), disparate treatment claims arise from language in the ADA prohibiting covered entities from "limiting, segregating, or classifying a job applicant or employee in a way that adversely affects the opportunities or status of such applicant or employee," 42 U.S.C. § 12112(b)(1), while failure to accommodate claims stem from language in the ADA defining discrimination in part as "not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual." 42 U.S.C. § 12112(b)(5)(A).

[9] The Family and Medical Leave Act of 1993 provides, in relevant part, that it is "unlawful for any employer to interfere with, restrain, or deny the exercise of or the attempt to

9

(ECF No. 1, at 16–24.) As relief, Ms. Vinson seeks "backpay, reinstatement (or front pay), compensatory, statutory, and liquidated damages, declaratory judgment, injunctive relief, and costs and attorney's fees." (ECF No. 1 ¶ 3; *see also* ECF No. 1, at 25–27.)

This Court has Federal Question jurisdiction under 28 U.S.C. § 1332.[10] However, Ms. Vinson alleges that Counts I and II, operative to this motion, come to the Court under 28 U.S.C. § 1367(a) as supplemental state law claims. (ECF No. 1 ¶ 4.)

On November 22, 2022, the City filed an Answer as well as the Partial Motion to Dismiss (the "Motion"). (ECF Nos. 7, 8.) In the Motion, the City seeks to dismiss Count I and Count II for failure to state a claim. (ECF No. 8.) On December 6, 2022, Ms. Vinson filed her response in which she agreed to the dismissal of Count I without prejudice but opposed the dismissal of Count II. (ECF No. 10.) On December 12, 2022, the City replied. (ECF No. 12.)

## II. Standard of Review: Rule 12(b)(6)

"A motion to dismiss under Rule 12(b)(6) tests the sufficiency of a complaint; importantly, it does not resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses." *Republican Party of N.C. v. Martin*, 980 F.2d 943, 952 (4th Cir. 1992) (citing 5A Charles A. Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1356 (1990)). To survive Rule 12(b)(6) scrutiny, a complaint must contain sufficient factual information to "state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*,

---

exercise, any right provided under this subchapter." 29 U.S.C. § 2615(a)(1). As the United States Court of Appeals for the Fourth Circuit has explained, "the FMLA provides proscriptive rights 'that protect employees from discrimination or retaliation for exercising their substantive rights under the FMLA.'" *Vannoy v. Fed. Rsrv. Bank of Richmond*, 827 F.3d 296, 304 (4th Cir. 2016) (citing *Dotson v. Pfizer, Inc.*, 558 F.3d 284, 294 (4th Cir. 2009)).

[10] 28 U.S.C. § 1331 provides that the "district courts shall have original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States."

10

550 U.S. 544, 570 (2007); *see also* Fed. R. Civ. P. 8(a)(2) ("A pleading that states a claim for relief must contain . . . a short and plain statement of the claim showing that the pleader is entitled to relief."). Mere "labels and conclusions" declaring that the plaintiff is entitled to relief are not enough. *Twombly*, 550 U.S. at 555. Thus, "naked assertions of wrongdoing necessitate some factual enhancement within the complaint to cross the line between possibility and plausibility of entitlement to relief." *Francis v. Giacomelli*, 588 F.3d 186, 193 (4th Cir. 2009) (quoting *Twombly*, 550 U.S. at 557) (internal quotation marks omitted).

A complaint achieves facial plausibility when the facts contained therein support a reasonable inference that the defendant is liable for the misconduct alleged. *See Twombly*, 550 U.S. at 556; *see also Ashcroft v. Iqbal*, 556 U.S. 662, 663 (2009). This analysis is context-specific and requires "the reviewing court to draw on its judicial experience and common sense." *Francis*, 588 F.3d at 193 (citation omitted). The court must assume all well-pleaded factual allegations to be true and determine whether, viewed in the light most favorable to the plaintiff, they "plausibly give rise to an entitlement to relief." *Iqbal*, 556 U.S. at 679; *see also Kensington*, 684 F.3d at 467 (finding that the court in deciding a Rule 12(b)(6) motion to dismiss "'must accept as true all of the factual allegations contained in the complaint' and 'draw all reasonable inferences in favor of the plaintiff'" (quoting *Kolon Indus.*, 637 F.3d at 440)). This principle applies only to factual allegations; however, and "a court considering a motion to dismiss can choose to begin by identifying pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth." *Iqbal*, 556 U.S. at 679.

### III. Analysis

Ms. Vinson filed a five-count complaint against the City. The City moves to dismiss Count I, Discrimination and Retaliation in Violation of Virginia Code § 8.01-216.8 (the

"VFATA Claim"), and Count II, Wrongful Termination in Violation of Public Policy (the "VHRA *Bowman* Claim"), against them.

The parties agree to the dismissal of Count I, and the Court will dismiss it without prejudice. The Court will dismiss Count II with prejudice because common law *Bowman* claims based on the policies expressed in the VHRA are prohibited.

### A. Because the Parties Agree to Its Dismissal, the Court Will Dismiss Ms. Vinson's VFATA Claim Without Prejudice

The City moves to dismiss Count I because Ms. Vinson's alleged conduct does not constitute a claim under the Virginia Fraud Against Taxpayers Act ("VFATA"). (ECF No. 10, at 1.) The City argues that Ms. Vinson does not state a claim, in part, because actionable claims under the VFATA must allege retaliatory conduct in response to an effort to stop a violation of the VFATA, not another statute such as the VHRA. In her response, Ms. Vinson agrees to the dismissal of the VFATA Claim without prejudice. (ECF No. 10, at 1.)

The City requests, however, that the Court dismiss Count I with prejudice because "[n]otably missing from the Opposition is any statement from [Ms. Vinson] that she will at any time in the future be able to put forth additional facts surrounding the events giving rise to her Complaint in order to allege a valid cause of action under VFATA." (ECF No. 12, at 1.)

The Court finds it unlikely that any amendment could cure the defects of Count I given that the alleged conduct does not appear to be a claim under the VFATA. On the record before it, however, the Court cannot find that amendment of Count I would be futile. The Court will, therefore, dismiss Count I without prejudice.

### B. Ms. Vinson's VHRA *Bowman* Claim Will Be Dismissed with Prejudice Because the VHRA Cannot Serve as the Predicate to a Common Law *Bowman* Claim

In Count II, Ms. Vinson asserts that the City violated the public policy underlying the Virginia Human Rights Act, Virginia Code § 2.2-3900, when it terminated Ms. Vinson's employment due to her disability and request for reasonable accommodations. (ECF No. 1 ¶¶ 71–74.) In doing so, Ms. Vinson articulates a "*Bowman* claim"[11] under the VHRA. The City contends that Count II should be dismissed because the VHRA provides its own remedy for violations, meaning it cannot support a *Bowman* claim. The City adds that this statutory remedy precludes Ms. Vinson from using a *Bowman* claim to vindicate the public policy articulated in the VHRA. For the reasons that follow, the Court will dismiss Count II with prejudice.

#### 1. Standard of Review: *Bowman* Claims

"Virginia adheres to a strong presumption that employment is at will, meaning employment lasts for an indefinite term and can be terminated for almost any reason." *Carmack v. Virginia*, No. 1:18-CV-00031, 2019 WL 1510333, at *9 (W.D. Va. Apr. 05, 2019) (citing *Lockhart v. Commonwealth Educ. Sys. Corp.*, 439 S.E.2d 328, 330 (Va. 1994)); *see also, e.g., Hice v. Mazzella Lifting Techs., Inc.*, 589 F. Supp.3d 539, 550 (E.D. Va. 2022). "However, a '*Bowman* claim' allows an at-will employee to bring a tortious wrongful discharge claim if the termination violates Virginia public policy as expressed in a Virginia statute." *Hice*, 589 F. Supp. 3d at 550 (citing *Bowman v. State Bank of Keysville*, 331 S.E.2d 797, 801 (Va. 1985)). Virginia courts expounding on *Bowman* have "consistently characterized [the public policy]

---

[11] *Bowman v. State Bank of Keysville*, 331 S.E.2d 797 (Va. 1985). As discussed, *Bowman* articulates an exception to Virginia's at-will employment doctrine and, in some circumstances, allows a cause of action for an employment termination that violates public policy.

exception [] as 'narrow.'" *Williams v. TMS Int'l, LLC*, 21cv260, 2021 WL 4071868, *4 (E.D. Va. Sept. 9, 2021) (internal citations and quotations omitted).

The Supreme Court of Virginia has recognized three situations in which a discharged employee may show her discharge violated public policy: (1) where an employer fired an employee for exercising a statutorily created right ("statutory right *Bowman* claim"); (2) where the public policy is "explicitly expressed in the statute and the employee was clearly a member of that class of persons directly entitled to the protection enunciated by the public policy"("employee public policy *Bowman* claim"); or, (3) "where the discharge was based on the employee's refusal to engage in a criminal act" ("refusal to commit crime *Bowman* claim"). *Rowan v. Tractor Supply Co.*, 559 S.E.2d 709, 711 (Va. 2002); *see also Hice*, 589 F. Supp. at 550–51; *Carmack v. Virginia*, No. 1:18-CV-00031, 2019 WL 1510333, at *9 (W.D. Va. Apr. 5, 2019).

### 2. Because the VHRA Cannot Serve as the Predicate for a *Bowman* Claim, the Court Will Dismiss Count II

Ms. Vinson seeks to file a discrimination claim against the City that would fall under the auspices of the second exception to at-will employment: she contends that her discharge violates the public policy of the VHRA that safeguards all individuals within the Commonwealth against unlawful discrimination in employment based on, among other things, disability.[12] Va. Code Ann. § 2.2-3900(B)(2) (2021). Because the City terminated her employment due to her disability in violation of VHRA public policy, Ms. Vinson says that she may, even as an at-will

---

[12] The VHRA's stated policy is to "[s]afeguard all individuals within the Commonwealth from unlawful discrimination in employment because of race, color, religion, national origin, sex, pregnancy, childbirth or related medical conditions, age, marital status, sexual orientation, gender identity, military status, or *disability*." Va. Code Ann. § 2.2-3900 (2021) (emphasis added).

employee, bring a tortious wrongful discharge claim. This is because VHRA's policy against employment termination due to a disability is "explicitly expressed in the statute and [Ms. Vinson is] clearly a member of that class of persons directly entitled to the protection enunciated by the public policy." *See Rowan v. Tractor Supply Co.*, 559 S.E.2d 709, 711 (Va. 2002). Although the VHRA provides a remedial mechanism by which a party can bring a cause of action for violations of the statute, *see* Va. Code Ann. §§ 2.2-3907 (2021) and 2.2-3908 (2020),[13] Ms. Vinson relies on the *public policy* against disability discrimination articulated in the VHRA as a basis for a common law *Bowman* claim. She cannot do so.

---

[13] Within the VHRA, § 2.2-3907(A) of the Code of Virginia allows any persons claiming to be aggrieved of unlawful discrimination to file a complaint with the Office of Civil Rights of the Department of Law (the "OCR"). Va. Code Ann. § 2.2-3907(A). Upon perfection of a complaint, the Office shall timely serve a charge on the respondent and provide all parties with a notice informing the parties of the complainant's rights. Va. Code Ann. § 2.2-3907(A). After investigation, the OCR determines whether sufficient evidence exists to support a finding of reasonable cause that the alleged discrimination happened and then creates a report. Va. Code Ann. § 2.2-3907(D). If the report concludes there is no reasonable cause to believe the alleged unlawful discrimination occurred, the charge will be dismissed, and the complainant will be given notice of his or her rights to commence a civil action. Va. Code Ann. § 2.2-3907(E).

Should the report conclude that there is a reasonable cause to believe that the alleged unlawful discrimination occurred, the parties shall be notified of such determination and the OCR will immediately endeavor to eliminate the unlawful practices by informal methods. Va. Code Ann. § 2.2-3907(F). Once the OCR determines such informal methods are unworkable, the OCR shall issue the complainant notice of his or her right to commence a civil action. Va. Code Ann. § 2.2-3907(F). Finally, the statute provides that a complainant may file a civil action in state court after 180 days have passed from the date the complaint was filed or if the OCR determines that it will be unable to complete its investigation within 180 days. Va. Ann. Code § 3907(F).

Section 2.2-3908(A) provides that:

> An aggrieved person who has been provided a notice of his right to file a civil action pursuant to § 2.2-3907 may commence a timely civil action in an appropriate general district or circuit court having jurisdiction over the person who allegedly unlawfully discriminated against such person in violation of this chapter.

Va. Code 2.2-3908(A).

### i.     History of VHRA *Bowman* Claims

No doubt exists that "[t]he use of the VHRA as a basis for a common law unlawful termination claim has a complicated history." *Hice*, 589 F. Supp. 3d at 551. A recent decision by a court in the Western District of Virginia offers thoughtful analysis explaining why Ms. Vinson cannot pursue her VHRA cause of action in the manner she attempts. *Tattrie v. CEI-Roanoke, LLC*, No. 7:23-CV-079, 2023 WL 4186383, at *4 (W.D. Va. June 26, 2023). "For the purposes of determining whether a plaintiff may premise a *Bowman* claim on an alleged VHRA violation, three time periods are relevant: pre-1995; 1995–2020; and post-2020." *Tattrie*, 2023 WL 4186383, at *4.

"From its enactment in 1987 through its amendment in 1995, the VHRA did not provide a private right of action[, and . . . . a]gainst this backdrop, the Virginia Supreme Court held that the *Bowman* exception to the at-will employment doctrine 'includes instances where . . . employees are terminated because of discrimination' based on the VHRA's public policies." *Tattrie*, 2023 WL 4186383, at *4 (quoting *Lockhart v. Commonwealth Educ. Sys. Corp.*, 439 S.E.2d 328, 331–32 (Va. 1994)).

In 1995, however, the VHRA was amended to include two consequential additions: first, the legislature added a private right of action, Va. Code Ann. § 2.1-725(B) (1995); and second, the legislature added what the *Tattrie* Court has called the "Preclusion Provision," which stated that "[c]auses of action based upon the public policies reflected in this chapter shall be exclusively limited to those actions, procedures and remedies, if any, afforded by applicable federal or state civil rights statutes or local ordinances," Va. Code Ann. § 2.1-725(D) (1995). *Tattrie*, 2023 WL 4186383, at *4.

In *Doss v. Jamco, Inc.*, the Virginia Supreme Court answered a certified question about the effect of the 1995 amendments to the VHRA by stating that stating that in amending the Act by adding subsection D to Va. Code § 2.1-725, the Preclusion Provision, "the General Assembly plainly manifested an intent to abrogate the common law with respect to causes of action for unlawful termination of employment based upon the public policies reflected in the Act." 492 S.E.2d 441, 447 (Va. 1997).

"After *Doss*, courts consistently rejected the use of the VHRA as a basis for *Bowman* claims." *Hice*, 589 F. Supp. 3d at 551 (citing *Wright v. Hilldrup Moving & Storage*, No. 1:16-CV-1349, 2017 WL 2262842, at *5 (E.D. Va. May 23, 2017) (finding that there is "no recognized Virginia common law claim for wrongful termination on the basis of age, race, sex or other protected categories covered by the Virginia Human Rights Act")). Eventually, what had been codified at § 2.1-725 (1995) was moved to § 2.2-3903 (2012), with § 2.1-725(D) (1995) becoming § 2.2-3903(D) (2012).

### ii. The 2020 Amendments to the VHRA

In 2020, the Virginia General Assembly overhauled the VHRA. The modifications included the repeal of Virginia Code § 2.2-3903 in its entirety. However, the Assembly also added two provisions: (1) Virginia Code § 2.2-3907 which outlines the process by which an individual can make a VHRA complaint with the Virginia Office of Civil Rights; and, (2) Virginia Code § 2.2-3908 which provides that citizens may only sue under the VHRA once they have been provided a notice of their right to file a civil action pursuant to § 2.2-3907.

Ms. Vinson contends that by repealing § 2.2-3903(D), the so-called Preclusion Provision, "the 2020 General Assembly may fairly be presumed to have sanctioned the restoration of the common law *Bowman* claim based on the VHRA's policies." (ECF No. 10, at 6.) This is

because, according to Ms. Vinson, "subsection D . . . [was] the provision that the *Doss* Court had interpreted as abrogating the common law." (ECF No. 10, at 5.) Ms. Vinson avers that "if the General Assembly had wished to supplant the common law wrongful discharge claim with a statutory remedy, it could have left intact section 2.2-3903(D). But it did not do so." (ECF No. 10, at 5.)

However, as the *Tattrie* Court aptly identifies, "the 2020 amendments do not return the VHRA to its pre-1995 state, in which there was no private right of action. Instead, the current VHRA provides for an administrative process followed by a private right of action." *Tattrie*, 2023 WL 4186383, at *5. Specifically, the General Assembly added §§ 2.2-3907 and 2.2-3908 which outline extensive procedures mandating that an aggrieved employee must first file a complaint with the VOCR and then, after receiving a right-to-sue notice from the agency, file a civil suit.

"Numerous Virginia courts have found that 'statutes containing their own remedy cannot also support a *Bowman* claim.'" *Tattrie*, 2023 WL 4186383, at *5 (quoting *Carmack v. Virginia*, 2019 WL 1510333, at *13 (W.D. Va. Apr. 5, 2019) (collecting cases)).[14] Allowing a VHRA

---

[14] Ms. Vinson cites two Virginia Circuit Court cases, *Foster v. Fraternal Order of Eagles*, 108 Va. Cir. 409, 413 (Rockingham County Aug. 19, 2021) and *Chenault v. RBI Corp.*, 108 Va. Cir. 529, 533 (Hanover County Oct. 22, 2021), for the proposition that a *Bowman* claim can be based on a public policy contained in a statute that provides a remedial action for its violation. (ECF No. 10, at 16.)

Regarding *Foster*, Ms. Vinson overstates the conclusion of that case. In *Foster*, the court denied demurrer and allowed a statutory right *Bowman* claim to move forward based on the policy of Virginia Code § 4.1-304 (which the *Foster* Court found creates a duty on individuals, and in particular bartenders, to prevent the sale of alcohol to intoxicated individuals). The *Foster* Court also allowed a whistleblower statutory claim under Virginia Code § 40.1-27.3. The Court did not allow a both a whistleblower statutory claim as well as a *Bowman* claim to proceed based on the underlying policy of the whistleblower statute. *See Foster*, 108 Va. Cir. at 413.

The *Chenault* Court denied demurrer and, without explication, allowed both a wrongful discharge claim under Virginia Code § 40.1-27.3 and a *Bowman* claim of wrongful discharge based on the same statute to move forward. *Chenault*, 108 Va. Cir. at 533. However, the Court

18

*Bowman* claim here would contravene the purpose of the 2020 Amendments that added a comprehensive administrative review process. As other courts have concluded after the 2020 Amendments to the VHRA, a plaintiff "cannot work around the structure, limitations, and remedies of the VHRA by a bringing a related *Bowman* claim. The VHRA prescribes an extensive remedial scheme that employees must follow when relying on the rights and policies articulated in the Act." *Hice*, 589 F. Supp. 3d at 553 (concluding that a plaintiff cannot proceed with a *Bowman* claim because the VHRA provides its own comprehensive remedial scheme and contemplates employees bringing a cause of action based on discrimination under the statute); *Jordan v. Sch. Bd. of the City of Norfolk*, Civil No. 2:22cv167, —— F.Supp.3d ——, ——, 2022 WL 16835868, at *11 (E.D. Va. Nov. 9, 2022); *Tattrie*, 2023 WL 4186383, at *5 (dismissing a *Bowman* claim because allowing it would undermine the administrative process outlined in the 2020 Amendments to the VHRA).

"Removing the § 2.2-3903 language does not automatically allow *Bowman* claims[] when the VHRA articulates its own cause of action and remedy." *Hice*, 589 F. Supp. 3d at 554; *Tattrie*, 2023 WL 4186383, at *5. Because the VHRA cannot serve as predicate for a common law *Bowman* claim, the Court will dismiss Count II with prejudice.

---

finds its nonbinding conclusion unpersuasive. Instead, "[n]umerous Virginia courts have found that 'statutes containing their own remedy cannot also support a *Bowman* claim.'" *Tattrie*, 2023 WL 4186383, at *5 (quoting *Carmack v. Virginia*, 2019 WL 1510333, at *13 (W.D. Va. Apr. 5, 2019) (collecting cases)).

## IV. Conclusion

For the foregoing reasons, the Court will GRANT the Defendants' Partial Motion to Dismiss. The Court will dismiss Count I without prejudice and will dismiss Count II with prejudice. An appropriate Order shall issue.

It is SO ORDERED.

Date: 07/28/2023
Richmond, Virginia

/s/
M. Hannah Lauck
United States District Judge